## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BALANCED BRIDGE FUNDING, LLC,<br>40 East Montgomery Avenue, Suite 416<br>Ardmore, Pennsylvania 19003,<br>                Plaintiff,<br><br>v.<br><br>SOUTH RIVER CAPITAL, LLC,<br>2661 Riva Road, Building 1000, Suite 1020<br>Annapolis, Maryland 21401,<br><br>and<br><br>JAMES E. PLACK,<br>1500 Wild Cranberry Drive<br>Crownsville, Maryland 21032,<br>                Defendants. | Civil Action No. _____ |

## COMPLAINT

Plaintiff Balanced Bridge Funding, LLC ("Balanced Bridge"), by and through its undersigned counsel, hereby files this Complaint for tortious interference with contract against defendants South River Capital, LLC ("South River Capital") and James E. Plack ("Plack") (collectively, "Defendants"), and alleges as follows:

## INTRODUCTION

1. This is an action for tortious interference with contract.  With knowledge that Darryl F. Skrine's August 30, 2019 loan agreement with Centennial Bank ("Centennial") required a $1 million balloon payment on March 15, 2020 and prohibited Mr. Skrine from incurring additional debt in excess of $100,000 or encumbering Centennial's collateral until he had satisfied that obligation, South River Capital loaned Mr. Skrine approximately $2 million on or before March 4, 2020, taking a security interest in collateral it knew Mr. Skrine had already pledged to Centennial.  Thereafter, to benefit or attempt to benefit South River Capital, Plack (its principal)

willfully, wantonly and outrageously influenced, encouraged and induced Mr. Skrine to default on the Centennial obligation, including after Centennial had assigned the obligation to Balanced Bridge and after Balanced Bridge had commenced an enforcement action against Mr. Skrine in Florida.  Defendants' actions are all the more willful, wanton and outrageous considering that Plack procured the $1 million Centennial loan—though another affiliate, South River Sports, LLC ("SRS")—so that Mr. Skrine could pay $903,000 to satisfy his then-outstanding obligations to South River Capital.  Following Mr. Skrine's recent bankruptcy filing, Balanced Bridge brings this action to recover compensatory and punitive damages for Defendants' tortious interference.

## PARTIES

2. Plaintiff Balanced Bridge is a specialty finance company that is incorporated in the State of Delaware and has its principal place of business at 40 East Montgomery Avenue, Suite 416, Ardmore, Pennsylvania 19003; Balanced Bridge's sole member is a citizen of the Commonwealth of Pennsylvania.

3. Defendant South River Capital is specialty finance company that is incorporated in the State of Maryland and has its principal place of business at 2661 Riva Road, Building 1000, Suite 1020, Annapolis, Maryland 21401; upon information and belief, none of South River Capital's members are citizens of Delaware or Pennsylvania.

4. Defendant Plack is the principal of South River Capital and a citizen of the State of Maryland; Plack resides at 1500 Wild Cranberry Drive, Crownsville, Maryland 21032.

## JURISDICTION AND VENUE

5. Pursuant to 28 U.S.C. § 1332(a), this Court has jurisdiction because there exists complete diversity of citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.

2

6.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because a substantial part of the events giving rise to this action occurred in this judicial district and because Defendants are subject to personal jurisdiction here as they conduct business in the Commonwealth of Pennsylvania.

## STATEMENT OF FACTS

7.      Mr. Skrine is a professional football player for the Chicago Bears.

8.      As a result of at least two loan transactions with South River Capital, Mr. Skrine was indebted to South River Capital in the amount of $903,000 as of August 30, 2019.

### Plack Procures the Centennial Loan to Get South River Capital Paid

9.      On August 30, 2019, Mr. Skrine borrowed $1 million from Centennial to refinance his outstanding obligations to South River Capital (the "Centennial Loan"); the Closing Statement from the transaction shows that South River Capital received a $903,000 payoff at closing and that Mr. Skrine received cash out of $25,000.

10.     According to a Procurement Fee Agreement executed contemporaneously by Mr. Skrine, SRS (another entity run by Plack) received a $56,199.20 procurement fee at closing and another $32,832 in procurement fees between October 1, 2019 and January 1, 2020.

11.     Centennial and Mr. Skrine memorialized their agreement in a Secured Financial Transaction and Security Agreement (the "Security Agreement") and a Promissory Note (the "Note")—both executed on August 30, 2019.  True and correct copies of the Security Agreement and the Note are attached as "Exhibit A" and "Exhibit B," respectively.

12.     Under the Security Agreement, Mr. Skrine was required to make interest-only payments on the first of each month commencing October 1, 2019 with a $1 million balloon

3

payment due on March 15, 2020—timed to coincide with Mr. Skrine's receipt of a $2 million bonus from the Chicago Bears. See Security Agreement at §A(1).

13. SRS received a portion of its $32,832 post-closing procurement fee from each of Mr. Skrine's interest only payments on the Centennial Loan; SRS, South River Capital and Plack did not stand to receive any portion of the $1 million balloon payment due on March 15, 2020.

14. The Security Agreement required Mr. Skrine to deposit payments from the Chicago Bears (the "Pledged Payments") into a designated account at Centennial and authorized Centennial to debit that account in accordance with the agreed-upon schedule of payments. See Security Agreement at §B(2).

15. Mr. Skrine granted Centennial a first-priority security interest in the Pledged Payments and promised not to take any action that results in the Pledged Payments being no longer electronically deposited directly into the designated Centennial account. See Security Agreement at §C(1) and §E(1).

16. Further, the Security Agreement prohibited Mr. Skrine from additional borrowings over $100,000 without the lender's prior written consent:

> 7. During the entire term of the Loan, Borrower shall not be permitted to obtain unsecured debt exceeding $100,000.00 or secured debt exceeding $100,000.00 without the prior written consent of the Lender.

See Security Agreement at §E(7).

17. "In the event of a breach by [Mr. Skrine]," the Security Agreement required that he pay "all fees, costs and expenses incurred by the lender, including Lender's reasonable attorney's fees, incurred … to enforce the terms" of the agreement. See Security Agreement at §E(5).

18. Plack attended a videoconference closing for the Centennial Loan, wherein Mr. Skrine executed the Security Agreement and Note after going over his obligations to Centennial.

19. In view of Plack's involvement in procuring the Centennial Loan to payoff Mr. Skrine's outstanding obligations to South River Capital and his participation during the remote closing of the transaction, at all relevant times, South River and Plack were aware of Mr. Skrine's contractual obligations to Centennial—including the $1 million balloon payment due on March 15, 2020 and the prohibitions against additional borrowings in excess of $100,000 and further encumbrances of the Pledged Payments.

20. Following the closing of the Centennial Loan, South River Capital terminated the UCC financing statements it had recorded against Mr. Skrine's assets, including the Pledged Payments.

### South River Capital and Plack Tortiously Interfere With Centennial's/Balanced Bridge's Contract with Mr. Skrine

21. After the Centennial Loan but on or before March 4, 2020, South River Capital loaned Mr. Skrine an amount in excess of $100,000 (the "South River Capital Loan"), taking a security interest in the Pledged Payments as collateral for its advance.

22. Previously, in October 2019, Plack had recorded a UCC financing statement against Mr. Skrine and the Pledged Payments through another one of his lending entities, All Pro Capital Funding LLC.

23. Mr. Skrine did not obtain Centennial's prior written consent to take on the additional debt or to further encumber Centennial's collateral; thus, the South River Loan caused Mr. Skrine to default on his obligations under the Security Agreement and Note.

24. Neither Mr. Skrine, nor South River Capital notified Centennial of the South River Capital Loan.

25. At the time of the South River Capital Loan, South River Capital and Plack knew that Mr. Skrine had not satisfied his obligations to Centennial and that the South River Capital

5

Loan would cause Mr. Skrine to default under the Security Agreement and Note; among other things, Centennial's UCC financing statement remained of record when South River Capital recorded its UCC financing statement on March 4, 2020.

26. Thereafter, to benefit or attempt to benefit South River Capital, Plack influenced, encouraged and induced Mr. Skrine to default on the Centennial obligation by, among other things, failing to make the required $1 million balloon payment on or before March 15, 2020.

27. Despite promising not to take any action that would result in the Pledged Payments being no longer electronically deposited directly into the designated Centennial account, Mr. Skrine changed his direct deposit instructions with the Chicago Bears.

28. Mr. Skrine received a $2 million bonus from the Chicago Bears on or about March 15, 2020; however, as a result of Plack's encouragement (for the benefit or attempted benefit of South River Capital), Mr. Skrine did not use the $2 million bonus to satisfy his obligations to Centennial (later Balanced Bridge).

29. On or about April 21, 2020, Centennial assigned all of its right, title and interest in the Security Agreement and Note (hereafter, the "Balanced Bridge Loan") to Balanced Bridge through a Note Purchase and Sale Agreement, a true and correct copy of which is attached as "Exhibit C."

30. Thereafter, Mr. Skrine was made aware that Balanced Bridge held the Security Agreement and Note and that he should make the required payments directly to Balanced Bridge.

31. Once again, to benefit or attempt to benefit South River Capital, Plack influenced, encouraged and induced Mr. Skrine to default on the Balanced Bridge obligation by, among other things, failing to make the required $1 million balloon payment as well as failing to pay additional fees and interest that had accrued since March 15, 2020 as a result of his earlier breach.

32. On May 15, 2020, Balanced Bridge filed a Complaint against Mr. Skrine in the Circuit Court for Broward County, Florida (the "Florida Action"), seeking to recover amounts owing under the Security Agreement and Note.

33. Soon thereafter, South River Capital and Plack became aware of the Florida Action.

34. Once again, to benefit or attempt to benefit South River Capital, Plack continued to influence, encourage and induce Mr. Skrine to default on the Balanced Bridge obligation by, among other things, failing to make the required $1 million balloon payment as well as failing to pay additional fees, interest and costs owed to Balanced Bridge.

35. Mr. Skrine's lawyers in the Florida Action confirmed that Plack had influenced, encouraged and induced Mr. Skrine to ignore his obligations to Balanced Bridge and that Mr. Skrine had paid South River Capital instead of paying Balanced Bridge.

36. At all relevant times, Mr. Skrine's income from the Chicago Bears should have been sufficient to satisfy his obligations to Balanced Bridge; however, Plack influenced, encouraged and induced Mr. Skrine to ignore those obligations to benefit or attempt to benefit South River Capital.

37. Defendants' interference with Balanced Bridge's contract with Mr. Skrine was unjustified and intended to procure a breach of the Security Agreement and Note by Mr. Skrine.

38. Defendants' tortious interference with Balanced Bridge's contract with Mr. Skrine is wanton, willful and outrageous not only because Defendants were aware of the Balanced Bridge Loan, but also because Plack procured the transaction in the first instance as a means to satisfy Mr. Skrine's previous obligations to South River Capital and because Defendants' interference was designed to enrich themselves at Balanced Bridge's expense.

**Mr. Skrine Files for Bankruptcy**

39. On October 16, 2020, Mr. Skrine filed a voluntary petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois.

40. Mr. Skrine's bankruptcy schedules list a $2 million obligation to South River Capital among his debts.

41. As a result of Defendants' tortious interference with Mr. Skrine's contract with Balanced Bridge, Mr. Skrine has not satisfied his outstanding obligations under the Security Agreement and Note, which presently exceed $1,300,000.

**COUNT I – TORTIOUS INTERFERENCE WITH CONTRACT**

42. Balanced Bridge incorporates the allegations of paragraphs 1 through 37 as if fully set forth herein.

43. As the successor to Centennial, Balanced Bridge has a valid contract with Mr. Skrine as set forth in the Security Agreement and Note.

44. At all relevant times, South River Capital and Plack were aware of the Centennial/Balanced Bridge Loan and that Mr. Skrine would breach his obligations thereunder by failing to make the $1 million balloon payment by March 15, 2020, by incurring additional debt in excess of $100,000, or by encumbering his pledged collateral.

45. Notwithstanding such knowledge, South River Capital extended the South River Loan to Mr. Skrine, causing Mr. Skrine to breach his promises under the Security Agreement and Note.

46. To benefit or attempt to benefit South River Capital, Plack influenced, encouraged and induced Mr. Skrine to default on his payment obligations to Centennial and, later, to Balanced Bridge—further aiding and inducing Mr. Skrine's breach of the Security Agreement and Note.

47. Mr. Skrine had the ability to satisfy his obligations to Balanced Bridge; however, because of Defendants' tortious interference, Mr. Skrine did not fulfill those obligations and instead declared bankruptcy.

48. Defendants' actions proximately caused harm to Balanced Bridge.

49. Defendants' actions were neither justified nor excused.

50. Defendants' actions were willful, wanton and outrageous.

WHEREFORE, Balanced Bridge respectfully requests judgment in its favor and against Defendants as set forth in its Prayer for Relief.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Balanced Bridge respectfully requests judgment in its favor and against Defendants for:

a) compensatory damages in excess of $1,300,000;

b) its attorneys' fees and costs;

c) punitive damages; and

d) any other remedies the Court deems just and appropriate.

Respectfully submitted,
**FOX ROTHSCHILD LLP**

November 3, 2020

<u>By:   /s/ Peter C. Buckley</u>
Peter C. Buckley, Esq.
Trisha B. Stein, Esq.
2000 Market Street
20th Floor
Philadelphia, PA 19103-3222
Telephone:    (215) 299-2854
Facsimile:    (215) 299-2150
Email: PCBuckley@foxrothschild.com
*Attorneys for Plaintiff*
*Balanced Bridge Funding, LLC*